```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _9/2/2022____
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

BOBBY GRUBBS,

                         Plaintiff,


         -against-                          21-cv-02906 (NSR)


KATIE NGBODI, R.N., F.N.P., LYNN B.              ORDER & OPINION
WEINRIT, R.N., SANGEETHA L. MUKKATT,
R.N., NURSE WHO SERVED AS NURSING
PROVIDER #574 at FISHKILL CORRECTIONAL
FACILITY, and JOHN AND JANE DOES 1-10,

                          Defendants.
_____

NELSON S. ROMÁN, United States District Judge:

       Plaintiff Bobby Grubbs ("Plaintiff"), a prisoner in custody of the New York State

Department of Corrections and Community Supervision (hereinafter "DOCCS"), brings this action

for deliberate indifference to serious medical needs under the Eighth Amendment, pursuant to 42

U.S.C. § 1983 ("Section 1983") and New York medical malpractice law.  Plaintiff asserts each of

his claims against the following registered nurses, in their official and individual capacities, who

treated Plaintiff at the Fishkill Correctional Facility (together, "Defendants"): (i) Katie Ngbodi,

R.N., F.N.P.; (ii) Lynn B. Weinrit, R.N.; (iii) Sangeetha L. Mukkatt, R.N.; and (iv) an unnamed

nurse referred to as "Nurse #574."  Plaintiff also names John and Jane Does 1-10, who were

persons in charge of the custodial and/or medical care provided to Plaintiff at relevant times.[1]

(Am. Compl. ¶ 34.)

_____

[1]      Plaintiff alleges that all defendants were "were acting under color of State law and/or as agents, servants,
employees, and/or contractors of DOCCS." (Am. Compl. ¶ 29.)

Now before the Court is Defendants' motion to dismiss the Amended Complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(1) and (6).  For the following reasons, the motion is GRANTED, and Plaintiff's claims are dismissed without prejudice.

## **BACKGROUND**

The following facts are taken from Plaintiff's Amended Complaint (ECF No. 21) and are accepted as true for purposes of this motion.

Plaintiff is a 52-year old[2] African American male who has been in DOCCS custody since around October 8, 2009.  (Am. Compl. ¶¶ 1, 37).  In July 2020, Plaintiff was diagnosed with Stage IV-B Gleason prostate cancer with metastasis and lymphovascular invasion.  (*Id*.)  Plaintiff also received an HIV diagnosis in or around 1997, which requires him to undergo physical examination and bloodwork every 90 days.  (*Id*. ¶ 40.)

Plaintiff received a prostate-specific antigen ("PSA") screening upon being incarcerated under DOCCS custody on or around October 14, 2009, which reflected normal results at 1.890 ng/mL.  (*Id*. ¶¶ 3, 41.)  On or about December 31, 2009, Mr. Grubbs was transferred to Great Meadows Correctional Facility ("Green Meadows") located in Comstock, New York.  (*Id*. ¶ 42.).  While at Green Meadows, in or around 2012, Plaintiff began to experience urinary start-and-stop problems, and made complaints to DOCCS medical staff.  (*Id*. ¶ 4, 42–43.)  In or around January 2013, Plaintiff began to be prescribed with a urinary retention medication named Flomax (Tamsulosin) by Dr. David Karandy, M.D., who acted as Plaintiff's primary care physician at Green Meadows.  (*Id*. ¶ 43.)

---

[2]     Plaintiff alleges this was his age at the time of his filing of the Amended Complaint.  (Am. Compl. ¶ 1.)

Plaintiff received another PSA screening on or around April 16, 2013, which reflected elevated results at 3.80 ng/mL.[3]  (*Id*. ¶ 44.)  Plaintiff continued to be prescribed Flomax by Dr. Karandy.  (*Id*.)  From that point through July 2020, Plaintiff was not offered nor did he receive PSA testing, or any urology care treatment other than being administered Flomax.  (*Id*. ¶¶ 6–7, 45–46.)

Plaintiff complained about his urinary issues to DOCCS medical personnel at various facilities he was housed in between 2013 to 2018, including at Great Meadows Correctional Facility, Coxsackie Correctional Facility, Upstate Correctional Facility, Clinton Correctional Facility, and Green Haven Correctional Facility.  (*Id*. ¶ 47.)  While residing at Clinton Correctional Facility, Plaintiff filed a grievance that was appealed to the Central Office Review Committee on April 14, 2015, explaining that a prison physician refused to renew Plaintiff's Flomax prescription, causing him to feel the constant urge to urinate.  (*Id*. ¶ 48.)

On or around August 16, 2018, Plaintiff was transferred to Fishkill Correctional Facility ("Fishkill").  (*Id*. ¶¶ 8, 49.)  Plaintiff's medical and correctional records were also automatically transferred with him to Fishkill.  (*Id*. ¶¶ 8, 50.)  Plaintiff presented himself to the Fishkill infirmary complaining of pain and discomfort in his back and abdomen on several occasions including on: December 24, 2018, when he was examined by Defendant Nurse #574; February 7, 2019, when he was examined by Defendant Ngbodi; April 9, 2019, when he was examined by Defendant Weinrit; April 25, 2019, when he was examined by Defendant Nurse #574; and May 15, 2019

---

[3]        Plaintiff states that a PSA level of 4.0 ng/mL is the standard cut-off for indications of cancer and is generally associated with a 25% chance of having prostate cancer. (Am. Compl. ¶¶ 5, 18.)  Plaintiff argues that therefore, his 2013 test results "required close monitoring, urology consultation, and periodic surveillance including, at a minimum, annual PSA follow-up tests."  (Am. Compl. ¶ 5.)  Plaintiff also cites to a medical literature stating that African American men are at a higher risk of prostate cancer. (*Id*. ¶ 2, n.1.)  In addition, the American Cancer Society Recommendations, which Plaintiff cites to, indicate that "screening should be done yearly for men whose PSA level is 2.5 ng/mL or higher." (*Id*. ¶ 2, n.2) (citing American Cancer Society Recommendations for Prostate Cancer Early Detection, *accessible at* https://www.cancer.org/cancer/prostate-cancer/detection-diagnosis-staging/acs-recommendations.html) (last visited on Aug 30, 2022).

(when he had to reschedule physical therapy due to stomach discomfort, which request was sent to Defendant Ngbodi).  (*Id*. ¶ 54.)  Plaintiff also filed a grievance on or around October 7, 2018 explaining that he complained to Defendant Ngbodi regarding his daily stomach problems.  (*Id*.) During each visit, Defendants prescribed pain medications or physical therapy.  (*Id*. ¶ 55.)  Plaintiff was also not given the option to be examined by a physician or urologist.[4]  (*Id*.)

On July 30, 2019, Plaintiff met with an unnamed infirmary nurse for abdominal pain aggravated by passing stool.  (*Id*. ¶ 58.)  The nurse checked that Plaintiff's "abdominal sound" was present, suggested that he hydrate, and discharged him to his cell.  (*Id*.)  Defendant Ngbodi reviewed this encounter and renewed Plaintiff's Flomax and Zantac prescriptions.  (*Id*. ¶ 59.)  On September 1, 2019, Defendant Nurse #574 requested new prescription scripts for Flomax and Zantac.  (*Id*. ¶ 60.)

Defendant Ngbodi ordered and reviewed Mr. Grubbs' bloodwork, including on September 17, 2018, November 9, 2018, May 1, 2019, September 3, 2019, October 16, 2019, and December 10, 2019.  (*Id*. ¶ 63.)  Defendant Ngbodi reviewed these blood lab results each time and signed off that "[n]o action is required at this time" without a review or co-signature by a physician.  (*Id*.) Defendant Ngbodi did not include PSA testing as part of the test analyses.  (*Id*.)

By early 2020, Plaintiff experienced constant sharp pains in his lower abdomen and back as well as urinary retention and difficulty voiding, even though he took Flomax.  (*Id*. ¶ 65.)   He also experienced worsening pain when trying to urinate and frequent urges to urinate.  (*Id*.)  On January 13, 2020, Plaintiff was seen by Defendant Mukkatt at the infirmary and complained about

---

[4]      Plaintiff alleges that his medical records refer to Defendant Ngbodi as his Primary Care Physician, though she is a Family Nurse Practitioner.  (Am. Compl. ¶ 57.)  According to Plaintiff, DOCCS' Health Care Services Protocol 1.20 requires elevation of care to a physician or transfer to a hospital when "care beyond nursing is required."  (Am. Compl. ¶ 62.)

an unrelieved stomach pain.   Defendant Mukkatt checked Plaintiff's abdominal sound and discharged him with medications for heartburn and stomach gas.  (*Id*. ¶ 66.)

On May 18, 2020, Plaintiff presented himself to the infirmary complaining he had to strain each time he had a bowel movement.  (*Id*. ¶ 70.)  He was seen by an unnamed infirmary nurse, who told Plaintiff that he should drink liquids and eat fruits and vegetables even though Plaintiff stated that the problem persisted regardless of diet and felt different from stomach issues he experienced in the past.  (*Id*.)  Defendant Ngbodi subsequently examined Plaintiff, diagnosed him with constipation, and discharged him with laxative and stool softener prescriptions.  (*Id*.)

The next day, Plaintiff wrote a letter to Fishkill's Deputy Superintendent of Health that stated:

> "I have had sharp pains shooting throughout my entire body. If Dr. Ngbodi wasn't rushing me out of her office I would have felt confident enough to discuss this with her. … SOMETHING IS SERIOUSLY WRONG WITH MY BODY: straining hard to pee, straining hard to move bowels, sharp pains throughout my whole body – stabbing and piercing pain, everywhere! I think it's CANCER … but I need a DOCTOR to get properly diagnosed." (emphasis in original).

*Id*. ¶ 72.

Plaintiff requested a copy of this letter to be placed as part of his medical records.  (*Id*.) On May 27, 2020, Plaintiff requested an emergency sick call and was seen by Defendant Weinrit at the infirmary, who noted in Plaintiff's records that he was experiencing "sharp stabbing pains," urinating frequently, and that he was referred to a provider.  (*Id*. ¶ 73.)  Weinrit asked Defendant Ngbodi to examine the Plaintiff the same day.   (*Id*.)   Defendant Ngbodi noted additional complaints such as "body aches," "cramps in pelvic area," and "burning urination," and thereafter diagnosed Plaintiff with a urinary tract infection ("UTI").  (*Id*. ¶¶ 76–77.)  Defendant Ngbodi

ordered a urinalysis and a 10-day antibiotic without diagnostic imagery or a blood test that included PSA screening.  (*Id*. ¶ 77.)

On June 9, 2020, Plaintiff was seen at the infirmary by Mariamma Baby, N.P. because he was experiencing unrelieved sharp pain in the lower abdomen despite having completed the UTI antibiotic treatment prescribed by Defendant Ngbodi.  (*Id*. ¶ 82.)  Nurse Baby recommended an urgent abdominal x-ray and follow-up with a primary care practitioner.  (*Id*.)

On June 17, 2020, Defendant Ngbodi saw the Plaintiff for review of the abdominal x-ray, and determined that Plaintiff was suffering from constipation.  (*Id*. ¶ 83.)  She discharged Plaintiff to his cell on an enema treatment.  (*Id*.)

On or around June 29, 2020, Plaintiff requested a primary care physician visit at the infirmary for small bowel movement issues.  (*Id*. ¶ 87.)  Defendant Ngbodi examined Plaintiff and ordered a stool softener.  (*Id*.)  After this visit, Defendant Ngbodi ordered Defendant Weinrit to perform a PSA test on Plaintiff, but this test was not carried out prior to Plaintiff's emergent transfer to a hospital on July 8, 2020.  (*Id*.)

On July 1, 2020, Plaintiff submitted a written request that reiterated his difficulty and pain when urinating, his constant feeling of needing to urinate, and sleeplessness in connection with these issues.  (*Id*. ¶ 89.)  Plaintiff requested to see a specialist and to receive diagnostic testing.  (*Id*.)  Plaintiff was called to the infirmary on July 2, 2020 and seen by Defendant Mukkatt, who performed a cursory examination of Plaintiff, and after finding no bladder distention, encouraged Plaintiff to drink fluids, and discharged him to his cell.  (*Id*. ¶ 90.)

On or around July 6, 2020, Plaintiff requested another sick call, where he expressed severe pain and requested to see a urologist.  (*Id*. ¶ 93.)  His left leg was swollen with pitting edema due to water retention.  (*Id*. ¶ 93.)  He was admitted to the infirmary by a nurse on July 8, 2020 for

observation and treatment of urinary retention.  (*Id*. ¶ 93.)  The nurse at the infirmary spoke to a physician, Dr. Wolf, who recommended catheterization to relieve the build-up.  (*Id*. ¶ 94.)  However, Plaintiff was returned to his unit without being catheterized.  (*Id*. ¶ 95.)  Around three hours later, Plaintiff was found bended over a toilet and was taken to the infirmary complaining of severe abdominal discomfort and distention.  (*Id*.)  Plaintiff remained in pain with a swollen abdomen after receiving a catheter.  (*Id*.)  Soon after, a doctor gave an order to have Plaintiff transferred to the Montefiore Mount Vernon Hospital's ("Mount Vernon") Emergency Department.  (*Id*. ¶ 95.)

Plaintiff was admitted to Mount Vernon that evening for probable prostate cancer.  (*Id*.)  The next morning, Plaintiff received PSA testing, which reported a severely elevated score of 210.92 ng/ml.  (*Id*. ¶ 98.)  On July 13, 2020 Plaintiff underwent a medical procedure at Mount Vernon to shave off part of his prostate.  (*Id*. ¶ 99.)  His surgical biopsy revealed a Stage IV-B prostate cancer with a Gleason score of 9, along with lymphovascular invasion.  (*Id*. ¶¶ 18, 100.)  Plaintiff was discharged back to Fishkill Correctional Facility on July 17, 2020, and he began to receive cancer treatment.  (*Id*. ¶ 101.)

Plaintiff experienced delays in his oncology care and treatment while at Fishkill, including in receiving prescribed medications, scheduling timely follow-up appointments, getting responses to sick call requests, and receiving sanitary items.  (*Id*. ¶¶ 102, 105.)  Plaintiff was also unaware of his prognosis and learned of his advanced stage of cancer from a family member who communicated with a surgeon at Mount Vernon.[5]  (*Id*. ¶¶ 103–04.)

Plaintiff filed grievances to Fishkill's Grievance Office, including on or around September 17, 2020.  (*Id*. ¶ 114.)  On or around October 1, 2020, the Inmate Grievance Resolution Committee

---

[5]      Plaintiff states that DOCCS policy prohibited him from learning of his specific diagnosis.  (Am. Compl.  ¶ 103.)

acknowledged that "two months have gone by without any services being rendered to treat his condition" and noted that "grievant's provider is currently working to expedite the approval for scheduling purposes due to grievant's diagnosis, receiving priority care." (*Id*.) The Inmate Grievance Resolution Committee did not address Plaintiff's complaints regarding the past delay in diagnosis. (*Id*.) Plaintiff appealed the decision to Fishkill's Superintendent, who denied such appeal on or around October 6, 2020. (*Id*. ¶ 115.) Plaintiff submitted an appeal to the Central Office Review Committee, which was decided on or around March 29, 2021.[6] (*Id*.)

On or around June 2021, Plaintiff was transferred to the Groveland Correctional Facility in Sonyea, New York. (*Id*. ¶¶ 18, 47.)

Plaintiff seeks an unspecified amount of damages to be determined at trial, plus punitive damages, costs, and attorneys' fees with respect to his injuries, including his Stage IV-B prostate cancer, lymphovascular invasion of cancer, metastasis of cancer outside of the prostate capsule, distant metastasis of cancer, terminal illness, loss of years of life, loss of quality of life, loss of enjoyment of life, pain and suffering, and emotional distress, among other injuries.

## LEGAL STANDARD

### I.      Fed. R. Civ. P. 12(b)(1)

A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it. *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). Without jurisdiction, the Court lacks the "power to adjudicate the merits of the case." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 55 (2d Cir. 2016). It is well-settled that the party invoking the Court's jurisdiction "bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Aurecchione v.*

---

[6]      Plaintiff does not provide factual allegations regarding the decision by the Central Office Review Committee.

*Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005) (citing *Luckett v. Bure*, 290 F.3d 493, 497 (2d Cir. 2002)).  A plaintiff's lack of standing is grounds for dismissal under Rule 12(b)(1).  *Buonasera v. Honest Co.*, 208 F. Supp. 3d 555, 560 (S.D.N.Y. 2016).

## II.   Fed. R. Civ. P.  12(b)(6)

In deciding a motion to dismiss under Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Freidus v. Barclays Bank PLC*, 734 F.3d 132, 137 (2d Cir. 2013).  To survive a motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Mere "labels and conclusions" or "formulaic recitation[s] of the elements of a cause of action will not do"; rather, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. In applying these principles, the Court may consider facts alleged in the complaint and documents attached to it or incorporated by reference. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002) (internal quotation marks and citation omitted).

## III.   Section 1983

Section 1983 provides that "[e]very person who, under the color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983.  Section 1983 "is not itself the source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3, 99 S. Ct. 2689, 61 L.Ed.2d 433 (1979); *see also Patterson v.*

*Cty. of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004).  To state a claim under Section 1983, a plaintiff must allege (1) "the challenged conduct was attributable to a person who was acting under color of state law" and (2) "the conduct deprived the plaintiff of a right guaranteed by the U.S. Constitution." *Castilla v. City of New York.*, No. 09 Civ. 5446(SHS), 2013 WL 1803896, at *2 (S.D.N.Y. Apr. 25, 2013); *see also Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010).

## DISCUSSION

Plaintiff raises two claims against the Defendants.  First, he raises claims against all Defendants for deliberate indifference to medical needs pursuant to Section 1983, in violation of the Eighth Amendment.  (Am. Compl. ¶¶ 136–49.)  Second, Plaintiff raises a common law medical malpractice claim against all Defendants "not subject to Correction Law § 24"[7] for their alleged negligence.  (Am. Compl. ¶¶ 150–71.)  Defendants argue that Plaintiff's claims should be dismissed because (1) Plaintiff fails to state a cause of action, (2) Plaintiff's state law claim is barred from being heard by this Court under N.Y. Corrections Law § 24; and (3) Defendants are entitled to qualified immunity.  (Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss (ECF No. 28) ("Defs.' Br.") at 1.)  For the reasons stated below, Plaintiff's claims are DISMISSED.

### I.    Deliberate Indifference to Medical Needs

The Eighth Amendment guarantees freedom from "cruel and unusual punishment."  U.S. Const. amend. VIII.  This includes depriving prisoners of their "basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety." *Helling v. McKinne*y, 509 U.S. 25, 32, 113

---

[7]    New York's Correction Law § 24 prohibits individuals from seeking damages against state employees, including in their personal capacities, for claims "arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee," unless such claims are brought in the New York Court of Claims as against the State. *See* Corrections Law § 24(1), (2).

S.Ct. 2475, 125 L.Ed.2d 22 (1993) (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Serv.*, 489 U.S. 189, 200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989)).  For a plaintiff to establish that a prison official violated the Eighth Amendment, "(1) the alleged deprivation must, as an objective matter, be 'sufficiently serious,' [*i.e.*, the 'objective prong'] and (2) the alleged perpetrator—ordinarily a prison official—must possess a 'sufficiently culpable state of mind' [*i.e.*, the 'subjective prong.'].'" *Randle v. Alexander*, 960 F. Supp. 2d 457, 470 (S.D.N.Y. 2013) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

For the objective prong, "the alleged deprivation must be 'sufficiently serious,' in the sense that 'a condition of urgency, one that may produce death, degeneration, or extreme pain' exists." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) (quoting *Nance v. Kelly*, 912 F.2d 605, 607 (2d Cir. 1990)).  There are several factors that courts may consider when deciding whether a medical condition is "sufficiently serious," including "chronic and substantial pain or the presence of a medical condition that significantly affects an individual's daily activities." *Salgado v. DuBois*, 17-cv-6040 (NSR), 2019 WL 1409808, at *5 (S.D.N.Y. Mar. 28, 2019).  If the challenged conduct "is an unreasonable delay or interruption in that treatment, the seriousness inquiry focuses on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (internal quotation marks, citations, and brackets omitted).

For the subjective prong, the prison official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety" that would result from his or her act or omission. *Jones v. Avanzato*, No. 14-cv-2044 (NSR), 2016 WL 183565 at *3 (S.D.N.Y. Jan. 13, 2016) (citing *Farmer*, 511 U.S. at 837).  However, "[i]t is well-established that mere disagreement over the proper treatment does not create a constitutional claim." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998).  In

11

addition, medical malpractice "does not rise to the level of a constitutional violation unless the malpractice involves culpable recklessness—'an act or a failure to act by [a] prison doctor that evinces a conscious disregard of a substantial risk of serious harm.'" *Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011) (quoting *Chance*, 143 F.3d at 703).  Therefore, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Id*. (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

### A.  Objective Prong

Plaintiff argues, and Defendants expressly concede, that Plaintiff satisfies the objective prong.  (Pl.'s Opp. at 13–14; Defs.' Reply (ECF No. 30) at 1 n.1).  Because the parties do not disagree on this prong, the Court deems this element satisfied, and now turns to the subjective prong of the deliberate indifference analysis to determine whether Defendants had a sufficiently culpable state of mind.

### B.  Subjective Prong

Defendants argue that Plaintiff fails on the subjective element because Plaintiff offers no factual allegations supporting an inference that Defendants "had a state of mind that is the equivalent of criminal recklessness." (Defs.' Reply at 1.)  Defendants aver that Plaintiff merely claims that the Defendants were ignorant of Plaintiff's condition and misdiagnosed his complaints as urinary tract infection and bowel problems and provided treatment for those conditions.  (Defs.' Reply at 2.)   Their main point is that the exercise of medical judgment, even if erroneous, is not deliberate indifference, and that a medical provider's ignorance is insufficient to meet the subjective element.  (*Id*.)  Defendants add that in any event, Plaintiff is already properly seeking

recourse for medical negligence in the New York Court of Claims pursuant to Corrections Law §
24. (*Id*.)

Plaintiff, on the other hand, argues that Defendants' negligent treatment does rise to the
level of culpable recklessness, and that the Defendants were well aware of the substantial risk of
harm arising from their failure to test Plaintiff for prostate cancer or refer him to specialist. (Pl.
Opp. at 16.) In particular, Plaintiff argues that (1) the Defendants had access to Plaintiff's medical
records and overlooked the fact that he had been on Flomax since 2013, yet his conditions
worsened during the time he was at Fishkill; (2) Plaintiff was in a demographic group susceptible
to prostate cancer and already presented a slightly elevated PSA score as of April 2013 (which
Defendants should have gathered from his medical chart), and therefore Plaintiff should have
received testing for prostate cancer at an earlier point; (3) and that Defendants failed to timely
order prostate testing or provide a physician or specialist referral in over 20 separate sick calls
between August 2018 and July 2020. (*Id*.)

The law on this point makes clear that "medical malpractice does not become a
constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106; *see also
Carter v. Akinyombo*, No. 21-CV-00872 (NSR), 2022 WL 2307679, at *7 (S.D.N.Y. June 27,
2022) ("simple negligence, or inadvertent failure to provide adequate medical care, even if it
amounts to medical malpractice, is not enough to plausibly allege deliberate indifference to an
inmate's Eighth Amendment rights") (internal citation omitted). A plaintiff must show that the
acts or omissions of defendants "involved more than lack of due care, but rather involved obduracy
and wantonness in placing his health in danger." *LaBounty v. Coughlin,* 137 F.3d 68, 72 (2d
Cir.1998).

It also is well-settled that "disagreements over medications, diagnostic techniques, forms of treatment or the need for specialists or the timing of their intervention" are insufficient under Section 1983. *Estelle,* 429 U.S. at 106. Indeed, "an inmate's preference of an alternative treatment, or feeling that he did not get the level of medical attention he desired, does not evidence a sufficiently culpable state of mind." *Coke v. Med., Dep't of Corr. & Cmty. Supervision*, No. 17 CIV. 0866 (ER), 2018 WL 2041388, at *4 (S.D.N.Y. Apr. 30, 2018) (citing *Sonds v. St. Barnabas Hosp. Correctional Health Servs*., 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001)). Generally speaking, "prison medical officers have wide discretion in treating prisoners, and "federal courts are generally hesitant to second guess medical judgments and to constitutionalize claims which sound in tort law." *Id*. (citing *Sonds*, 151 F. Supp. 2d at 311–12).

There are instances, however, where medical negligence rises to the level of an Eighth Amendment violation—for example, where "officials deliberately delayed care as a form of punishment, ignored a 'life-threatening and fast-degenerating' condition for three days, or delayed major surgery for over two years." *Id*. (citing cases); *see also Lowrance v. Coughlin*, 862 F. Supp. 1090, 1116 (S.D.N.Y. 1994) (finding plaintiff was deprived of medical care when his knee surgery was delayed due to various retaliatory prison transfers, causing pain and suffering). Courts have found deliberate indifference in other instances, such as where a prison official deliberately ignores a gash on a prisoner's face that is becoming infected. *Chance*, 143 F.3d at 702. A finding of deliberate indifference may also arise from prison doctors' failure to follow-up with an MRI referral for nine months where an inmate was already diagnosed with rotator cuff syndrome, expressed consistent and extreme pain during numerous infirmary visits, and lost mobility in his arm. *See Lloyd v. Lee*, 570 F. Supp. 2d 556, 561–63, 568–69 (S.D.N.Y. 2008); *see also Leckie v. City of New York*, No. 19CV6719PGGRWL, 2022 WL 2442375, at *14 (S.D.N.Y. June 30, 2022)

(finding deliberate indifference where a doctor "himself determined that [an infected] tooth needed to be extracted but failed to follow up and failed to respond to a follow-up written request directed to him."). In addition, a prison doctor who fails to inform an inmate that he discovered broken hip pins, thereby delaying necessary surgery and causing the inmate extreme pain for nearly two years, constitutes deliberate indifference. *See Hathaway v. Coughlin*, 37 F.3d 63, 65, 67– 68 (2d Cir.1994). Moreover, nurses' failure to provide physical therapy services to an inmate with muscular dystrophy, in clear contravention of treating physicians' prescriptions, constituted deliberate indifference. *Stevens v. Goord*, 535 F.Supp.2d 373, 386–87 (S.D.N.Y.2008).

In these instances where courts have found deliberate indifference beyond medical negligence, the defendants were aware of the inmates' severe medical conditions and the need to act, yet they failed to do so. *See, c.f., Freire v. Zamot*, No. 14-CV-304 (SLT) (LB), 2016 WL 6330405, at *4–5 (E.D.N.Y. Oct. 27, 2016) ("a defendant cannot be found liable for deliberate indifference "unless [he is] ... both ... aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and ... draw[s] the inference.").

Here, upon careful review of Plaintiff's Amended Complaint, the Court finds that the factual allegations do not plead an Eighth Amendment violation by any of the Defendants. While the factual allegations likely "entered the realm of medical negligence, it does not rise to the level of culpability required for a deliberate indifference claim." *Coke*, 2018 WL 2041388, at *4. The crux of Plaintiff's claim is ultimately that the Defendants misdiagnosed Plaintiff's symptoms and failed to provide a PSA test to detect prostate cancer sooner—but these allegations fail to provide a basis of an Eighth Amendment violation. Plaintiff's own pleadings show that the Defendants were each providing care to the Plaintiff during each of his infirmary visits. As Plaintiff alleges, between 2018 to early 2020, Plaintiff frequently complained about gastrointestinal and urinary

problems during infirmary visits.  Each time, Plaintiff was checked by one of the Defendants or another nurse and was prescribed pain, stomach, and constipation medications, Flomax, and/or physical therapy to help with his symptoms.  (Am. Compl. ¶¶ 54–70.)  *See, e.g., Sheils v. Flynn*, 9:06-CV-407, 2009 WL 2868215, at *17 (N.D.N.Y. Sept. 2, 2009) (no deliberate indifference despite failure to diagnose cancer where "[p]laintiff received frequent medical care" and "[m]edical staff prescribed various medications in an attempt to relieve his symptoms.").

Plaintiff's allegations also show that after his symptoms became more acute in mid-May 2020, Defendants took additional action.  For example, Defendant Weinrit directed Plaintiff to Defendant Ngbodi, his designated primary care physician, to examine him after he complained of sharp pains and urinary strain, and Defendant Ngbodi thereafter diagnosed Plaintiff with a UTI, ordered a urinalysis, and gave Plaintiff a 10-day antibiotic treatment.  (Am. Compl. ¶¶ 75–76.) While this diagnosis ultimately proved to be incorrect, misdiagnoses and medical misjudgments are not sufficient to form the basis of a constitutional violation.  *Shomo v. Dep't of Corr. & Cmty. Supervision*, No. 21-CV-00128 (PMH), 2022 WL 1406726, at *11 (S.D.N.Y. May 4, 2022) ("Misdiagnosing a condition is not the same as being deliberately indifferent to it"); *Haynes v. City of New York*, No. 19-CV-01925, 2020 WL 4926178, at *11 (S.D.N.Y. Aug. 20, 2020) ("[A]llegations of negligent misdiagnosis . . . do not suggest that the defendant acted with a conscious disregard to inmate health or safety.").

Plaintiff also alleges that when he continued expressing unrelieved pain after completing the UTI treatment, he received an x-ray that was reviewed by Defendant Ngbodi and was determined (albeit erroneously) to be suffering from constipation.  (Am. Compl. ¶¶ 82–83.) Finally, Defendant Ngbodi ordered co-Defendant Weinrit to perform a PSA test after Plaintiff presented himself to the infirmary with bowel issues on June 29, 2020.  (*Id*. ¶ 88.)  Plaintiff was

also transferred to the hospital on the same day that he was found bended over a toilet and expressed severe abdominal discomfort and distention.  (*Id*. ¶ 95.)

Plaintiff faults Defendants for not having ordered a PSA test or other diagnostic test earlier, but Defendants' failure to do so does not evince deliberate indifference because there are no factual allegations that they knew or inferred that Plaintiff was at a serious risk of prostate cancer.  Plaintiff argues that Defendants had access to his medical chart and should have known to provide a PSA test in light of his elevated 2013 PSA score of 3.8 ng/mL.  (Pl. Opp. at 1–2.)  Plaintiff's argument, however, is bellied by his own allegation that "the standard cut-off for indication of cancer is 4.0 ng/mL," (Am. Compl. ¶ 18), and other allegations that Plaintiff received no PSA test between 2013 to 2018 even though he was transferred between four other facilities and was examined by doctors at those facilities for urinary issues.  (Am. Compl. ¶ 44–47.)  What Plaintiff's allegations show is that Defendants provided the same course of treatment when he arrived at Fishkill as was provided at the other facilities (*i.e.* Flomax prescriptions).   These allegations undermine Plaintiff's arguments that Defendants acted in a manner that was deliberately indifferent when treating him at Fishkill.

Certainly, Defendants' failure to elevate Plaintiff's recurring issues to a supervising physician or specialist, or to recommend diagnostic testing at an earlier point, indicates possible (perhaps even severe) medical negligence.  Plaintiff also presents concerning allegations indicating that the Defendant nurses, and in particular Defendant Ngbodi, were not well supervised by physicians, and that proper standards of care were not being followed with respect to diagnostic procedures.  In addition, while Defendants argue that under N.Y. Ed. Law § 6902, Defendant Ngbodi (Plaintiff's designated primary care practitioner) could effectively function as a physician even though she was just a nurse practitioner (Defs.' Br. at 3), that argument is contradicted by the

clear text of the law, which requires nurses to collaborate with licensed physicians.  *See* N.Y. Ed. Law § 6902 (3)(a)(i) ("The practice of registered professional nursing by a nurse practitioner . . . may include the diagnosis of illness and physical conditions and the performance of therapeutic and corrective measures within a specialty area of practice, in collaboration with a licensed physician . . .").  Nonetheless, with respect to the Eighth Amendment claim presented here, Plaintiff fails to offer well-pled factual allegations that the Defendants knew that Plaintiff was at a serious risk of prostate cancer when they treated him, or that they otherwise engaged in a conscious disregard of a substantial risk of serious harm.  Therefore, the Court dismisses Plaintiff's Eighth Amendment claim without prejudice.[8]

## II.  Plaintiff's Medical Malpractice Claim Under New York Law

Because Plaintiff has failed to sufficiently plead any claims arising under federal law, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims, even if Plaintiff had plead his medical malpractice claims.[9]  *See In re Merrill Lynch Ltd. Partnerships Lit.*, 154 F.3d 56, 61 (2d Cir. 1998) ("[The Second Circuit] and the Supreme Court have held that when [ ] federal claims are dismissed the 'state claims should be dismissed as well.'"); *Bennett v. Care Corr. Sol. Med. Contractor*, No. 15 Civ. 3746 (JCM), 2017 WL 1167325, at *10 (S.D.N.Y. Mar.

---

[8]      The Court notes that Plaintiff alleges that he filed grievances with Fishkill's Grievance Office on or around September 17, 2020, and that the Inmate Grievance Resolution Committee acknowledged on or around October 1, 2020 that Plaintiff had not received services to treat his cancer in two months, and that scheduling would be expedited in order to provide priority care. (Am Compl. ¶ 114.)  While such delay may signal deliberate indifference, given that he had been diagnosed with prostate cancer at that point, Plaintiff fails to allege which, if any, of the Defendants had engaged in the delay in his oncology treatment.  *See Fate v. Goord*, No. 11 CIV. 7493 RWS, 2012 WL 3104884, at *7 (S.D.N.Y. July 31, 2012) ("To state a Section 1983 claim for damages against an individual defendant, a plaintiff must allege specific facts to show that each defendant was directly or personally involved in the alleged violation of the Constitution or laws") (internal quotation and citation omitted).

[9]      Under New York Law, "[t]he essential elements of a medical malpractice claim are a departure from good and accepted medical practice and evidence that such departure was a proximate cause of plaintiff's injury."  *Gale v. Smith & Nephew, Inc*., 989 F. Supp. 2d 243, 252 (S.D.N.Y. 2013) (quoting *Williams v. Sahay*, 783 N.Y.S.2d 664, 666 (2d Dep't 2004)).

24, 2017) (dismissing state-law claims where Court would only retain jurisdiction over these claims based on supplemental jurisdiction).

Moreover, Plaintiff's claims are precluded by Correction Law § 24.  The Second Circuit has long-held that Correction Law § 24 precludes a plaintiff from raising state law claims in federal court against state officers in their personal capacities for alleged actions arising within the scope of their employment. *See Baker v. Coughlin*, 77 F.3d 12, 16 (2d Cir. 1996).  Instead, Plaintiff can only bring such claims in New York's Court of Claims.   *See* Correction Law § 24(2).  Correction Law § 24, notably, does not apply to independent contractors working on DOCCS' behalf.  *See Fontaine v. Cornwall*, 2019 WL 4257136, at *8 (N.D.N.Y. 2019).

Plaintiff argues that he "explicitly limited the scope of the state law claim to those Defendants who are not subject to Correction Law § 24" and explicitly concedes that "[t]o the extent that the Defendants are in fact DOCCS employees subject to the Correction Law, the state law claims simply do not apply to them and they do not have a reason to move on this ground." (Pl.'s Opp. at 24.)  Plaintiff does not specify in his Amended Complaint whether the Defendants are employees, and instead broadly alleges that they each are an "agent, servant, employee, and/or contractor of DOCCS."  (Am. Compl. ¶¶ 30, 32, 33.)  Plaintiff also states that "[p]rior to discovery, Plaintiff cannot reasonably ascertain whether some of the Defendants are in fact independent contractors not covered by the Correction Law, and it is against those Defendants that the state law claims were pled."  (Pl.'s Opp. at 24.).  At this stage, however, Plaintiff fails to adequately plead that the Defendants are exempt from Correction Law § 24.

Plaintiff's state law claim is therefore dismissed without prejudice.

### III.    <u>Qualified Immunity</u>

Defendants argue that even if Plaintiff states a claim, they are entitled to qualified immunity. (Defs.' Br. at 7–8.)   The doctrine of qualified immunity gives "officials 'breathing room to make reasonable but mistaken judgments about open legal questions.'" *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866, 198 L. Ed. 2d 290 (2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011)).   As such, "qualified immunity shields both state and federal officials from suit unless [1] the official violated a statutory or constitutional right that [2] was clearly established at the time of the challenged conduct." *Terebesi v. Torreso*, 764 F.3d 217, 230 (2d Cir. 2014) (internal quotation marks omitted).   To determine whether a right was clearly established, courts look to: (1) "the specificity with which a right is defined"; (2) the existence of Supreme Court or the applicable circuit court case law on the subject; and (3) whether it was "objectively reasonable" for the defendant to believe the conduct at issue was lawful.   *Id*. at 231; *Gonzalez v. City of Schenectady*, 728 F.3d 149, 161 (2d Cir. 2013).

Because the Plaintiff fails to state any claim, the Court need not assess at this time whether the Defendants are entitled to qualified immunity.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion to dismiss the Amended Complaint is GRANTED.   Plaintiff is granted leave to file a Second Amended Complaint as to any claims that have not been dismissed with prejudice.   If he chooses to do so, Plaintiff will have until October 3, 2022 to file amended pleadings consistent with this Order.   Defendants are then directed to answer or otherwise respond by October 24, 2022.

If Plaintiff fails to file a Second Amended Complaint within the time allowed, and he cannot show good cause to excuse such failure, those claims dismissed without prejudice by this Order will be deemed dismissed with prejudice.

The Clerk of Court is respectfully directed to terminate the motion at ECF No. 27.

Dated:  September 2, 2022                                    SO ORDERED:

     White Plains, New York

_____

NELSON S. ROMÁN

United States District Judge